UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

STEVEN DUNMORE,

Plaintiff,

v.

SIDNEY D. DUNMORE, et al.,

Defendants.

No.  2:11-cv-2867 MCE AC PS

FINDINGS & RECOMMENDATIONS

On September 4, 2013, the court held a hearing on defendant Jeremy A. Dunmore's motion for judgment on the pleadings.  Steven Dunmore appeared in propria persona.  Daniel Croxall appeared on behalf of the moving defendant.  On review of the motion, the documents filed in support and opposition, upon hearing the argument of plaintiff and counsel, and good cause appearing therefor, THE COURT FINDS AS FOLLOWS:

RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

A.      Allegations Relevant to Jeremy A.'s Dunmore's Motion for Judgment on the Pleadings

In 1999, defendants Sidney D. Dunmore and Jeremy A. Dunmore ("defendant-brothers") formed GSJ Company, LLC ("GSJ LLC") with help from their grandfather, George Dunmore. Second Am. Compl. ("SAC") ¶ 36.  George Dunmore did not participate in the day-to-day operations of GSJ LLC, and in 2005 he sold his and/or the Dunmore Family Trust's ("the DF

1

1    Trust")[1] interest in the entity for $4,320,900.00.[2]  Id. ¶¶ 38-39.

2            Beginning in mid-2003 or early-2004, the defendant-brothers were unable to obtain

3    financing on their own to cover their expanding business, to complete or sell existing projects, or

4    to meet the financing requirements of banks and other private lenders from whom they sought

5    loans.  SAC ¶¶ 42-44.  As a result, they "agreed by words, conduct and overt acts, to unlawfully

6    and fraudulently procure and obtain a [sic] funding and multiple loans by unlawful means

7    including grand theft, identity theft, forgery and bank fraud (the alleged 'RICO Fraud Scheme')."

8    Id. ¶ 45.  Specifically, plaintiff accuses the defendant-brothers of (1) committing identity theft by

9    misusing their grandparents' names, forging their signatures, and misusing their social security

10   numbers to prepare false financial and loan documents; (2) acting in concert with multiple

11   Notaries Public to wrongfully verify the false and forged signatures of their grandparents; (3)

12   knowingly using interstate and/or foreign commerce to transmit and/or receive falsified loan

13   documents; and (4) knowingly using and misappropriating funds from said banks and other

14   private lenders to form and/or fund other business entities under their management and control,

15   primarily GSJ LLC.  Id. ¶ 46.

16           When the real estate market began to decline in mid-2006, Sidney D. and Jeremy A. were

17   unable to make interest payments on the loans that they fraudulently obtained.  SAC ¶ 49.

18   Accordingly, they made promises to Ruth Dunmore and the banks to repay in exchange for bank

19   forbearance agreements.  Id. ¶ 50.  The defendant-brothers also pressured Ruth Dunmore to sign

20   new loan guarantees and to make temporary payments on many of the forged loans.  Id. ¶¶ 50,

21   69-73.  Despite their promises to repay, the defendant-brothers continued to default on their

22   obligations.  Id. ¶¶ 50, 73.

23           As a result of the defendant-brothers' conduct, their grandparents were defrauded, "along

24   with multiple FDIC-insured depository or financial institutions (or 'banks') and numerous other

---

[1] The Dunmore Family Trust was created by Ruth Dunmore and her now-deceased husband George Dunmore in 1977.  Following George Dunmore's 2007 passing, Ruth allocated George's estate into separate trusts: 50% in a Survivor's Trust and 50% in a Decedent's Trust.  This action concerns the Decedent's Trust, of which Ruth is the Trustee.

[2] The defendant-brothers eventually defaulted on this obligation, which is the basis for a separate action to be prosecuted in state court.  See SAC ¶ 38.

1      private third party lender and investors, [of] cumulatively **$75 to $100 MILLION** . . . ."  SAC

2      ¶ 48 (emphasis in original).  See also id. ¶¶ 111-I, 123-27, 134 (listing the "Victim Financial

3      Institutions" harmed by the RICO Fraud Scheme).

4           As to this claim, plaintiff seeks $3,596,924 for losses and damages incurred and

5      unspecified sums for future damages and other losses to be incurred by adverse judgments or

6      other injuries.  In sum, plaintiff seeks damages triple the "base" sum of $107,746,178[3] for a total

7      RICO damages claim of $323,292,534.  See SAC ¶129.

8      B.     Procedural Background

9           This action was initially filed in the Sacramento County Superior Court and was removed

10     to this court on October 28, 2011 pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1441(b).  The

11     operative pleading is plaintiff's Second Amended Complaint ("SAC"), filed on April 16, 2012.

12     ECF No. 26.

13          Plaintiff is Steven G. Dunmore, Ruth Dunmore's son.  He is proceeding as the Assignee

14     of Claims for Ruth Dunmore, individually and as the Trustee of the DF Trust (collectively,

15     "Assignor"), the Named Beneficiary of the DF Trust, and the Attorney-in-Fact for Ruth

16     Dunmore.  Stated generally, plaintiff accuses Ruth Dunmore's grandsons (Sidney D. and moving

17     party Jeremy A.[4]) of obtaining loans either fraudulently or through undue influence from their

18     grandparents and then defaulting on the loans in the amount of $12,000,000 to $15,000,000.  Ruth

19     Dunmore settled some of these loans, but not all.  Because of Ruth Dunmore's age at the time that

20     these issues arose (she was 86), Ruth petitioned to sell the Trust's interest in claims against the

21     grandsons to plaintiff for $1 and 55% of any recovery.  The state court in Placer County granted

22     Ruth's petition and assigned the claims to plaintiff.  This assignment was affirmed on appeal.

23          The SAC names nineteen defendants, all of whom have been served and have now

24     appeared in this action: Sidney B. Dunmore; Jeremy A. Dunmore; Sidney D. Dunmore; GSJ

25     Company, LLC (dba "Dunmore Communities"); GSJ Company, LP; Kathleen L. Dunmore;

26

27     [3] This amount is equal to the sum total of funds received by the defendant-brothers from the various banks and private lenders.

28     [4] Sidney D. and Jeremy A. are the sons of defendant Sidney B. Dunmore.

1 Chady Evette Dunmore; Anthony J. Garcia; Claude F. Parcon; Kelly Houghton; Mary R. Neilson;

2 Shelli R. Donald; L. [Lynda] Tremain; Maximillion Capital, LLC; Canyon Falls; Acquisition

3 Venice, LP; Acquisition Phoenix-Miami, LP; Amberwood Investments, LLC; and Acquisition

4 West Hatcher, LP.

5       Plaintiff brings the following twelve claims: (1) violation of the Racketeer Influenced and

6 Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 – 1968; (2) RICO Criminal Conspiracy

7 (Civil RICO Liability); (3) Actual Fraud & Deceit – Financial Fraud & False Representation; (4)

8 Actual Fraud & Deceit – Fraudulent Concealment / Representation; (5) Financial Elder Abuse;

9 (6) Breach of Contract & Guaranty; (7) Unjust Enrichment; (8) Indemnity; (9) Fraudulent

10 Transfer; (10) Civil Conspiracy or Aiding and Abetting the Commission of Torts; (11) Successor

11 Entity Liability; and (12) Quia Timet.

12       Ruth Dunmore passed away in late January 2013.  She resided in Australia, and there is a

13 probate action presently pending in that country.  Plaintiff represents that his former power-of-

14 attorney lapsed by operation of state law, and he has not yet been appointed as Ruth's personal

15 representative by the probate court.

16 LEGAL STANDARDS

17       "After the pleadings are closed—but early enough not to delay trial—a party may move

18 for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  A Rule 12(c) motion may ask for

19 judgment on the basis of plaintiff's "[f]ailure to state a claim upon which relief can be granted."

20 Id. 12(h)(2)(B).  Such a motion is essentially equivalent to a Rule 12(b)(6) motion to dismiss, so a

21 district court may "dispos[e] of the motion by dismissal rather than judgment."  Sprint Telephony

22 PCS, L.P. v. Cnty. of San Diego, 311 F. Supp. 2d 898, 903 (S.D. Cal. 2004).

23       The purpose of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6)

24 is to test the legal sufficiency of the complaint.  N. Star Int'l v. Ariz. Corp. Comm'n, 720 F.2d

25 578, 581 (9th Cir. 1983).  "Dismissal can be based on the lack of a cognizable legal theory or the

26 absence of sufficient facts alleged under a cognizable legal theory."  Balistreri v. Pacifica Police

27 Dep't, 901 F.2d 696, 699 (9th Cir. 1990).  A plaintiff is required to allege "enough facts to state a

28 claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555

4

1  (2007).  Thus, a defendant's Rule 12(b)(6) motion challenges the court's ability to grant any relief

2  on the plaintiff's claims, even if the plaintiff's allegations are true.

3       In determining whether a complaint states a claim on which relief may be granted, the

4  court accepts as true the allegations in the complaint and construes the allegations in the light

5  most favorable to the plaintiff.  Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); Love v.

6  United States, 915 F.2d 1242, 1245 (9th Cir. 1989).

7  DISCUSSION

8  A.    RICO Standing

9       Defendant first moves for judgment on grounds that plaintiff lacks standing to pursue his

10  first and second causes of action, which are brought pursuant to 18 U.S.C. § 1962(c) and (d).

11       The Racketeer Influenced and Corrupt Organizations Act ("RICO") provides for civil as

12  well as criminal enforcement.  A civil remedy is provided for "[a]ny person injured in his

13  business or property by reason of a violation of section 1962. . ."  18 U.S.C. § 1964.  An injured

14  party may bring suit and recover treble damages.  Id.  To establish a RICO violation under 18

15  U.S.C. § 1962(c), a plaintiff must prove "'(1) conduct (2) of an enterprise (3) through a pattern

16  (4) of racketeering activity.'"  Resolution Trust Corp. v. Keating, 186 F.3d 1110, 1117 (9th Cir.

17  1999) (quoting Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985)).  To establish a

18  violation of 18 U.S.C. § 1962(d), a plaintiff must prove that the defendants conspired to engage in

19  a RICO violation.  To prevail on a civil RICO claim, a plaintiff "must show that he has suffered a

20  concrete financial loss."  Chaset v. Fleer/Skybox Int'l, LP, 300 F.3d 1083, 1086 (9th Cir. 2002)

21  (quotation marks and citation omitted).

22       To establish standing, a RICO plaintiff must show that a defendant's predicate acts were

23  the "but-for" and proximate cause of the alleged injury.  Holmes v. Sec. Investor Prot. Corp., 503

24  U.S. 258, 266-67 (1992).  The Supreme Court has held that but-for causation in insufficient to

25  support recovery under RICO; a plaintiff must demonstrate proximate causation as well.

26  Mendoza v. Zirkle Fruit Co., 301 F.3d 1163, 1168 (9th Cir. 2002) ("The key task is to determine

27  whether this injury was 'by reason of' the growers' alleged violations, a requirement the Supreme

28  Court has interpreted to encompass proximate as well as factual causation"); see Holmes, 503

5

1  U.S. at 265-66 (the RICO statute "can, of course, be read to mean that a plaintiff is injured 'by

2  reason of a RICO violation, and therefore may recover, simply on showing that the defendant

3  violated § 1962, the plaintiff was injured, and the defendant's violation was a 'but for' cause of

4  plaintiff's injury.  This construction is hardly compelled, however, and the very unlikelihood that

5  Congress meant to allow all factually injured plaintiffs to recover persuades us that RICO should

6  not get such an expansive reading" (citation and footnotes omitted)).  See also Imagineering, Inc.

7  v. Kiewit Pacific Co., 976 F.2d 1303, 1311 (9th Cir. 1992) ("In order to maintain a cause of

8  action under RICO then, the plaintiff must show not only that the defendant's violation was a 'but

9  for' cause of his injury, but that it was the proximate cause as well" (citation omitted)), cert.

10  denied, 507 U.S. 1004 (1993); accord Chaset v. Fleer/Skybox Intern., LP, 300 F.3d 1083, 1086-

11  87 (9th Cir. 2002); Oki Semiconductor Co. v. Wells Fargo Bank, Nat'l Ass'n, 298 F.3d 768, 773

12  (9th Cir. 2002); Resolution Trust Corp. v. Keating, 186 F.3d at 1117.

13          A proximate cause of injury is "'a substantial factor in the sequence of responsible

14  causation.'"  Oki Semiconductor, 298 F.3d at 773 (quoting Cox v. Admin. United States Steel &

15  Carnegie, 17 F.3d 1386, 1399 (11th Cir. 1994)).  To prove that an injury is proximately caused by

16  a RICO violation, a plaintiff must demonstrate that there is "a direct relationship between the

17  injury asserted and the injurious conduct alleged."  Imagineering, 976 F.2d at 1311 (citing

18  Holmes, 503 U.S. at 268); see id. ("One principle underlying this requirement is that the less

19  direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages

20  attributable to the violation, as distinct from other, independent factors," citing Holmes, 503 U.S.

21  at 269).

22          In deciding whether a plaintiff has adequately alleged proximate causation, the court

23  focuses on "three nonexhaustive factors . . . [which determine] whether the injury is 'too remote'

24  to allow recovery: (1) whether there are more direct victims of the alleged wrongful conduct who

25  can be counted on to vindicate the law as private attorneys general; (2) whether it will be difficult

26  to ascertain the amount of the plaintiffs' damages attributable to defendant's wrongful conduct;

27  and (3) whether the courts will have to adopt complicated rules apportioning damages to obviate

28  the risk of multiple recoveries."  Mendoza, 301 F.3d at 1169 (citing Ass'n. of Wash. Pub. Hosp.

1    Dists. v. Philip Morris Inc., 241 F.3d 696, 701 (9th Cir. 2001)).[5]  See also Pillsbury, Madison &

2    Sutro v. Lerner, 31 F.3d 924, 928 (9th Cir. 1994) ("These three policy concerns guide a court's

3    evaluation of the directness of the injury" (citation omitted)).

4            Analyzing these factors, the Supreme Court has held that a plaintiff cannot recover under

5    RICO for injuries caused to a third party.  See Holmes, 503 U.S. at 268-69 ("[A] plaintiff who

6    complained of harm flowing merely from the misfortunes visited upon a third person by the

7    defendant's acts was generally said to stand at too remote a distance to recover" (citations

8    omitted)).  The Ninth Circuit has applied this principle in several cases.  See, e.g., Oki

9    Semiconductor, 298 F.3d at 774 (holding that theft victims were not directly injured by a money

10   launderer's subsequent activities because "[o]nly after the theft occurred and the semiconductors

11   were sold could Tran launder the proceeds"); Welfare Trust Fund v. Philip Morris, Inc., 185 F.3d

12   957, 963-67 (9th Cir. 1999) (holding that health care trust funds that paid medical claims could

13   not sue tobacco companies under RICO because their injury was derivative of smokers' injury,

14   and stating: "A direct relationship between the injury and the alleged wrongdoing, although not

15   the 'sole requirement' of RICO . . . proximate causation, 'has been one of its central elements'"

16   (citations omitted)); Pillsbury, Madison & Sutro, 31 F.3d at 928-29 (holding that a sublessee was

17

18   _____

     [5] Mendoza discussed these factors in analyzing whether RICO plaintiffs had statutory standing to
     assert their claims.  See Mendoza, 301 F.3d at 1168-69.  Whether denominated "standing" or
19   "causation," however, the question is the same.  See id. at 1168 ("We turn first to the statutory
     standing requirements particular to RICO.  Under RICO, '[a]ny person injured in his business or
20   property by reason of a violation of section 1962 of this chapter may sue therefor in any
     appropriate United States district court' for civil damages.  18 U.S.C. § 1964(c). . . .  The
21   employees allege an injury to their property in the form of lost wages.  The key task is to
     determine whether this injury was 'by reason of the growers' alleged violations, a requirement the
22   Supreme Court has interpreted to encompass proximate as well as factual causation").  The
     Mendoza factors mirror concerns first expressed by the Supreme Court in Holmes regarding the
23   need that RICO injury be "direct."  See Holmes, 503 U.S. at 269-70 ("First, the less direct an
     injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages
24   attributable to the violation, as distinct from other, independent, factors.  Second, . . . recognizing
     claims of the indirectly injured would force courts to adopt complicated rules apportioning
25   damages among plaintiffs removed at different levels of injury from the violative acts, to obviate
     the risk of multiple recoveries.  And, finally, the need to grapple with these problems is simply
26   unjustified by the general interest in deterring injurious conduct, since directly injured victims can
     generally be counted on to vindicate the law as private attorneys general, without any of the
27   problems attendant upon suits by plaintiffs injured more remotely.").

28

                                                      7

not directly injured when RICO violations caused an increase in the rent charged to the primary

tenant, although the tenant passed the increases on to the sublessee); Imagineering, 976 F.2d at

1311 (holding that a subcontractor was not directly injured when a RICO violation prevented a

general contractor that would have retained it from obtaining a construction contract).

Here, plaintiff concedes that the financial institutions and private lenders were directly

harmed by the alleged RICO fraud scheme, and there is no disagreement that those entities and

individuals would have standing to bring a RICO claim against the defendant-brothers.  This

direct harm is referenced multiple times in the SAC: the defendant-brothers participated in the

RICO fraud scheme to "receiv[e] or otherwise obtain[] . . . illicit bank loan proceeds or other

beneficial financial instruments from . . . banks," SAC ¶ 109; the defendant-brothers defrauded

"the financial institutions (banks) and individual lenders to obtain multiple fraudulent loans," Id.

¶ 111-D; they participated in the RICO fraud scheme "in order to fraudulently obtain millions of

dollars," id. ¶ 111-F; and multiple banks were defrauded by the defendant-brothers, including

Yolo Community Bank, North Valley Bank, Umpqua Bank, and First Bank, id. ¶ 111-I.

Additionally, in his opposition, plaintiff asserts that the RICO fraud scheme was "orchestrated by

[the defendant-brothers] to obtain tens of millions of dollars in loans from both financial

institutions and private lenders," Opp'n at 5; that they "fraudulently borrowed up to $75-$100

Million from various financial institutions," id. at 6; and that, based on the defendant-brothers'

conduct, "the various financial institutions thereafter provided tens of millions of dollars in loans

to defendants Jeremy and Sidney-D and/or RICO enterprise GSJ-LLC, et al.," id. at 8.

In opposing defendant's motion, however, plaintiff argues that his Assignor *also* has

standing because she too was directly harmed by the RICO fraud scheme when she incurred an

obligation to repay the fraudulently-obtained loans.  Plaintiff argues that the harm incurred by

Ruth Dunmore puts her "on equal footing" with the financial institutions because, while the

financial institutions suffered harm as evidenced by the loss of millions of dollars, she suffered

harm as evidenced by her obligation to repay the loans.  Opp'n at 10.  Plaintiff readily admits,

however, that "a victim of forgery or identity theft may not be liable to a lender for funds

disbursed in reliance on forged documents . . . ."  Opp'n at 9; see also Cal. Com. Code § 3401(a)

("A person is not liable on an instrument unless (1) the person signed the instrument . . .").  Thus, any obligation incurred by plaintiff's Assignor to repay the debts is undermined by the fact of the forgery itself.[6]  In any case, an obligation to repay a loan cannot be deemed an injury to plaintiff's "business or property by reason of a violation of section 1962" since it is merely a potential duty and not a concrete financial loss.  See 18 U.S.C. § 1964(c); Berg v. First State Ins. Co., 915 F.2d 460, 464 (9th Cir. 1990).

This then leads to plaintiff's second argument for standing.  Plaintiff argues that his Assignor suffered the requisite direct harm when Ruth Dunmore, individually and as the Trustee of the DF Trust, incurred legal fees when forced to defend against banks and private lenders seeking to collect on the fraudulent loans.  Opp'n at 9.

1.    Plaintiff's Legal Fees Insufficient to Confer RICO Standing

Generally, RICO's civil provision gives a cause of action for those "injured in his business or property by reason of a violation of section 1962."  18 U.S.C. § 1964(c).  "Personal injuries," on the other hand, are not compensable under RICO.  Oscar v. University Students Cooperative Ass'n, 965 F.2d 783, 785 (9th Cir. 1992).  Whether incurring legal fees constitutes an injury to a plaintiff's "business or property" is a question as yet unanswered by the Ninth Circuit.

Some courts interpreting RICO's statutory language have held that attorneys' fees and legal expenses cannot constitute an injury sufficient to confer standing because the injury is either too remote to the alleged conduct or it fails to qualify as an injury to "business or property."  Evans v. City of Chicago, 434 F.3d 916, 931-32 (7th Cir. 2006) (attorneys' fees incurred in defending against false arrest not considered an injury to business or property under RICO), overruled on other grounds by Hill v. Tangherlini, 724 F.3d 965 (7th Cir. 2013); Engel v. Buchan, 778 F. Supp. 2d 846, 845 (N.D. Ill. 2011) (citing Evans to hold that incurring legal fees defending against criminal charges is insufficient to confer RICO standing); Kelley v. Watts, 2007 WL 3232080, at **2, 3 (E.D. Ark. 2007) (same); Kashelkar v. Rubin & Rothman, 97 F. Supp. 2d 383, 391 (S.D.N.Y. 2000) (expenditure of money on legal fees does not constitute requisite injury

---

[6] It is unclear what effect, if any, Ruth Dunmore's 2007 guarantees on the fraudulently-obtained loans would have on her obligation to repay the loans.  See SAC ¶ 50.

9

1    under RICO); Hotel, Motel, Restaurant & Hi–Rise Employees & Bartenders v. Pier 66 Co., 599

2    F. Supp. 761, 765 (S.D. Fla.1984) ("[Attorneys' fees] are incidental damages and do not rise to

3    the type of proprietary damage for which RICO provides compensation.  Thus, the Union fails to

4    state a cause of action under federal RICO law.").

5              Other courts, however, have held that incurring legal fees may, in certain circumstances,

6    qualify as an injury compensable under the RICO statute.  See Handeen v. Lemaire, 112 F.3d

7    1339, 1354 (8th Cir. 1997) (prior legal expense qualifies as injury to business or property); Kilper

8    v. City of Arnold, Mo., 2009 WL 2208404, at *12 (E.D. Mo. 2009) (citing Handeen and holding

9    expenditure of money on attorneys' fees sufficient to confer standing); Walter v. Palisades

10   Collection, LLC, 480 F. Supp. 2d 797 (E.D. Pa. 2007) (holding that the payment of legal fees to

11   defend against a fraudulent lawsuit can confer RICO standing); Burger v. Kuimelis, 325 F. Supp.

12   2d 1026, 1035 (N.D. Cal. 2004) (Walker, J.) ("Legal expenses are concrete financial losses, "not

13   mere injury to a valuable intangible property interest" and are thus recoverable under RICO.");

14   Lauter v. Anoufrieva, 642 F. Supp. 2d 1060, 1085 n.33 (C.D. Cal. 2009) (Powell, J.) (citing

15   Burger, 325 F. Supp. 2d at 1035, and Handeen, 112 F.3d at 1354).

16            In an action from the Eastern District of New York that is strikingly similar to the one

17   here, a plaintiff brought suit against his brother and nephews for civil RICO violations alleging,

18   inter alia, that these individuals raised funds from various banks, financial institutions, and other

19   lenders in part by forging plaintiff's signature.  Chera v. Chera, 2000 WL 1375271, at *3

20   (E.D.N.Y. Sept. 20, 2000).  The plaintiff asserted standing on the basis of legal fees incurred

21   while defending against proceedings initiated by the defrauded financial institutions to collect on

22   the debts.  Id. **8-9.  The district court rejected this argument, holding that "[plaintiff] has

23   incurred (or will incur) his claimed defense costs by reason of the partnership's default or

24   insolvency, i.e., not by reason of false statements or forgeries made in connection with obtaining

25   the loans."  Id. *9.  The Chera court contrasted the facts of the case before it with Bankers Trust

26   Co. v. Rhoades, 859 F.2d 1096 (2d Cir. 1988), where the plaintiff-creditor asserted standing on

27   the basis of legal fees incurred in connection with a debtor's fraudulently initiated frivolous

28   lawsuits and the debtor's bribery of a judge to prevent the creditor from collecting a debt.  The

1   Second Circuit allowed recovery of the "legal fees and other expenses incurred in fighting the

2   defendants' frivolous lawsuits" and "in overcoming bribe-induced decisions." Id. at 1105.

3        Closer examination of Bankers Trust and the other cases cited above in which legal fees

4   were deemed sufficient to confer standing, reveals that the link between the plaintiff's injury and

5   the conduct constituting the RICO violation was much more direct than the link asserted here.  As

6   previously stated, the Second Circuit in Bankers Trust held that plaintiff's legal fees could confer

7   standing because those fees were incurred in fighting frivolous lawsuits initiated *by the*

8   *defendants*, the very wrongful conduct that comprised the RICO claim.  See Bankers Trust, 859

9   F.3d at 1105.  The Second Circuit clarified the holding of Bankers Trust in Stochastic Decisions,

10  Inc. v. DiDomenico, 995 F.2d 1158, 1166-67 (2d Cir. 1993), finding that the mere expenditure of

11  money on legal fees is insufficient to confer RICO standing.  Rather, the fees must be directly

12  linked to the illegal conduct of the defendants that constitutes the RICO violations.  Similarly, in

13  Handeen, 112 F.3d at 1354, the Fifth Circuit held that legal fees can confer standing when

14  incurred in challenging fraudulent claims asserted by defendants in a bankruptcy action that they

15  initiated, the same wrongful conduct that formed the basis of the plaintiff's RICO claim.

16       In the present case, plaintiff asserts standing on the basis of legal fees incurred in

17  defending against actions instituted by the direct victims of the alleged RCIO violations -- the

18  financial institutions and private lenders -- to collect on debts.  The wrongful conduct that

19  underlies plaintiff's RICO claim is defendant's misuse of his "grandparents' names, forging their

20  signatures, and misusing their social security numbers to prepare false financial and loan

21  documents."  SAC ¶ 46.  As in Chera, plaintiff's legal fees were incurred as the result of the

22  defendant-brothers' default and not directly due to the forgeries made in connection with

23  obtaining the loans.  Therefore, the link between plaintiff's injury and defendant's wrongful

24  conduct is too remote to confer standing.

25       The same result is reached by applying the three factors identified in Mendoza, 301 F.3d

26  at 1169.  First, there are indeed more direct victims of the alleged wrongful conduct who can be

27  counted on to vindicate the law as private attorneys general.  Here, those victims are the financial

28  institutions and private lenders who incurred substantial financial losses as a direct result of the

1    defendant-brothers' alleged RICO fraud scheme.  Second, it would be difficult to ascertain the

2    amount of plaintiff's damages attributable to the defendant-brothers' wrongful conduct as

3    opposed to Ruth Dunmore's subsequent guarantees on the fraudulent loans.  As noted above,

4    Ruth Dunmore guaranteed the loans after they had been obtained in her name by the alleged fraud

5    and forgery.  Her act of guaranteeing the loans could constitute ratification of the fraudulent

6    conduct, a matter that is discussed in greater detail below.  Plaintiff's allegations that the

7    guarantees were obtained by improper means present collateral factual disputes that would further

8    complicate the assessment of damages.  Finally, in light of the many overlapping theories of relief

9    asserted in this case by plaintiff and the fact of Ruth Dunmore's guarantees of the fraudulent

10   loans, the court would have to adopt complicated rules apportioning damages to obviate the risk

11   of multiple recoveries.  <u>Compare</u> SAC ¶ 129 (plaintiff' damages calculations on RICO claim), ¶

12   192 (plaintiff's damages calculations on state common law conspiracy claim).

13          2.      <u>Intervening Cause</u>

14          Assuming arguendo that plaintiff's legal fees are a sufficiently direct injury for standing

15   purposes, defendant argues that Ruth Dunmore's guarantees constitute an intervening cause that

16   breaks the chain of causation and defeats standing.  As discussed above, a RICO plaintiff must

17   establish standing to sue under 18 U.S.C. § 1964(c), by demonstrating "that the defendants'

18   alleged misconduct proximately caused [the plaintiffs'] injury."  <u>Sosa v. DIRECTV, Inc.</u>, 437

19   F.3d 923, 941 (9th Cir. 2006) (internal quotation marks omitted).  In <u>Holmes</u>, the Supreme Court

20   emphasized that proximate cause for RICO purposes should be evaluated in light of its common-

21   law foundations; proximate cause thus requires "some direct relation between the injury asserted

22   and the injurious conduct alleged."  <u>Holmes</u>, 503 U.S. at 268.  A link that is "too remote," "purely

23   contingent," or "indirect[t]" is insufficient.  <u>Id.</u> at 271.  The Supreme Court more recently

24   clarified that this proximate cause requires "'some direct relation between the injury asserted and

25   the injurious conduct alleged'" and explicitly rejected forseeability as a standard for determining

26   proximate causation.  <u>Hemi Group, LLC v. City of New York</u>, 559 U.S. 1, 9 (2010) (quoting

27   <u>Holmes</u>, 503 U.S. at 268).

28          Defendant refers to the timeline of events as set forth in the SAC to argue that plaintiff's

attorneys' fees were not the direct result of the alleged predicate acts as required by RICO, but instead were the result of the Assignor's decision to guarantee loans that she knew were fraudulent:

> (1) The alleged RICO violations began in "mid-2003 or early 2004," SAC ¶¶ 42-46;
>
> (2) Between 2004 and 2007, the defendant-brothers obtained millions of dollars from financial institutions and private lenders through the RICO Fraud Scheme by forging the signatures of George Dunmore and/or Ruth Dunmore, id. ¶ 53;
>
> (3) "[T]he RICO Fraud Scheme first surfaced and was discovered between June 2006 and January 2007," id. ¶¶ 50, 144;
>
> (4) Between March 29, 2007 and September 6, 2007, and knowing of the fraudulent loans, Ruth Dunmore executed guarantees for the fraudulent loans and made temporary payments on many of the forged loans, id. ¶¶ 46, 75; and
>
> (5) On June 13, 2007, George and Ruth Dunmore and the DF Trust were sued by Arleen Foley and the Arleen Foley Family Trust to recover on certain defaulted loans, id. ¶¶ 56, 57.  In defending that action, plaintiff's Assignor expended $16,382.01 in attorneys' fees and was ultimately dismissed from the lawsuit.  Id. ¶ 58.

Defendant's point regarding an intervening cause is well-taken.  See City and County of San Francisco v. Philip Morris, 957 F. Supp. 1130, 1138 (N.D. Cal. 1997) (in an action brought by counties against cigarette manufacturers and others to recover increased health care costs incurred through treatment of smokers, the court held as a matter of law that "the actions of individual smokers [are] independent intervening causes of plaintiffs' injuries").  This court's analysis is hindered by the SAC's lack of clarity regarding relevant facts, including how many of the forged loans were guaranteed by Ruth Dunmore and the legal basis of the proceedings initiated against plaintiff to recover on the forged loans.  Nonetheless, to the extent that Ruth Dunmore and/or the DF Trust guaranteed *any* of the forged loans after learning of the defendant-brothers' fraudulent scheme, the court finds that those guarantees serve as an intervening cause that breaks the chain of causation on plaintiff's RICO claims, particularly since the forgeries may be deemed ratified upon the execution of the guarantees.  See Common Wealth Ins. Systems, Inc. v. Kersten, 40 Cal. App. 3d 1014, 1026 (1974) ("[U]nder Code section 3404, a forged signature may be ratified even where the forger is not the agent of the purported signer.") (citation omitted).

13

1    "To ratify, is to give validity to the act of another.  A ratification is equivalent to a previous

2    authority.  It operates upon the act ratified in the same manner as though the authority had been

3    originally given."  McCracken v. City of San Francisco, 16 Cal. 591, 623 (1860).  See also

4    Rakestraw v. Rodriguez, 8 Cal. 3d 67, 75 (1972) ("Joyce contends that her approval of the

5    transaction and acceptance of benefits was involuntary because at the time she discovered the

6    forgeries she could not rescind the transaction by returning the proceeds of the loan as they had

7    already been expended.  There is no merit in this contention.  Whether or not she was in a

8    position to return the proceeds of the loan, she could have disavowed the transaction and relieved

9    herself of potential liability by informing Acme and Security of the forgeries. (Cal. Com. Code, s

10   3404, subd. (1).)")

11          3.    Breach of Contract

12          Lastly, the court turns to plaintiff's argument that standing arises from the financial loss

13   Ruth Dunmore suffered when the defendant-brothers broke their promise to repay her for

14   payments she made to the financial institutions and/or lenders.  This argument fails because

15   plaintiff's RICO claim is not predicated on defendant's breach of contract, and the causal link

16   between plaintiff's injury and defendant's act of forging loan documents is too remote to confer

17   standing.  Holmes, 503 U.S. at 268

18          In light of plaintiff's failure to identify an injury sufficient to confer standing on the RICO

19   claims, defendant's motion for judgment on the pleadings should be granted on that basis.

20   B.    Fraud

21          Having concluded that plaintiff's federal claims must be dismissed, the undersigned will

22   recommend that the court decline to exercise supplemental jurisdiction over the remaining state

23   law claims pursuant to 28 U.S.C. § 1367(c).  Therefore, the court will not reach the merits of

24   defendant's motion as to plaintiff's third and fourth causes of action. [7]

25   ////

26

27   _____
     [7] Should the district judge assigned to this case decline to adopt these findings and
28   recommendations, defendant may renew his motion as to plaintiff's third and fourth causes of
     action.

1   Accordingly, IT IS HEREBY RECOMMENDED that:

2   1.   Jeremy A. Dunmore's August 2, 2013 motion for judgment on the pleadings (ECF No.

3         138) be granted in part;

4   2.   Plaintiff's RICO claims be dismissed without leave to amend;

5   3.   The court decline to exercise supplemental jurisdiction over plaintiff's remaining state

6         law claims; and

7   4.   This matter be remanded to the Placer County Superior Court for lack of federal

8         jurisdiction.

9   These findings and recommendations are submitted to the United States District Judge

10  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

11  after being served with these findings and recommendations, any party may file written

12  objections with the court and serve a copy on all parties.  Such a document should be captioned

13  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

14  objections shall be filed and served within fourteen days after service of the objections.   The

15  parties are advised that failure to file objections within the specified time may waive the right to

16  appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

17  DATED: October 8, 2013

18

19  ALLISON CLAIRE
    UNITED STATES MAGISTRATE JUDGE

20

21

22

23

24

25  /mb;dunm2867.mjp

26

27

28

15